# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2737 | **DATE** | 1/31/2001 |
| **CASE TITLE** | TIG INSURANCE COMPANY vs. CHICAGO INSURANCE COMPANY, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER: the motion to dismiss of defendants Giffin, Winning, Cohen & Bodewes, P.C., Carol Hansen Posegate, Gregory K. Harris and Arthur B. Cornell,Jr., is granted as to the malpractice claim asserted against them in Count II, which is dismissed without prejudice, and the legal subrogation claim asserted against them in count III, which is dismissed with prejudice. The conventional subrogation claim asserted against those defendants in Count I will stand. Chicago Insurance Company's motion to dismiss the direct action claim asserted against it in Count V is granted, and those claims are dismissed with prejudice. Plaintiff has 21 days from the date of this Memorandum Opinion and Order to amend the malpractice claim asserted in Count II, if it can do so and remain in compliance with Rule 11. If plaintiff does not amend the malpractice claim in that time period, it will be dismissed with prejudice. Status hearing set for 2/21/01 at 9:15a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | FEB 01 2001 date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TIG INSURANCE COMPANY, individually and as subrogee of Illinois State University, <br><br> Plaintiff, <br><br> v. <br><br> CHICAGO INSURANCE COMPANY, an Illinois corporation, GIFFIN, WINNING, COHEN & BODEWES, P.C., an Illinois professional corporation, and CAROL HANSEN POSEGATE, GREGORY K. HARRIS, and ARTHUR B. CORNELL, JR., individually, <br><br> Defendants. | No. 00 C 2737 <br> Paul E. Plunkett, Senior Judge |

DOCKETED FEB 01 2001

## MEMORANDUM OPINION AND ORDER

TIG Insurance Company has filed a five-count complaint against defendants seeking to recover money it paid to its insured, Illinois State University ("ISU"), for attorney's fees and costs that ISU incurred in connection with a class-action gender discrimination suit pending in the United States District Court for the Central District of Illinois. The attorney defendants, Giffin, Winning, Cohen & Bodewes, Carol Hansen Posegate, Gregory K. Harris and Arthur B. Cornell, Jr., and Chicago Insurance Company have each filed a Federal Rule of Civil Procedure ("Rule")12(b)(6) motion to dismiss the claims asserted against them. For the reasons set forth below, the attorney defendants' motion is granted in part and denied in part, and Chicago Insurance Company's motion is granted in its entirety.



## The Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

## Facts

ISU is insured under an excess liability insurance policy by TIG. (Compl., Ex. A.[1]) The policy obligates TIG to pay "on behalf of the insureds 'ultimate net loss' in excess of the 'self-insured retention' which the insureds shall be legally obligated to pay for any civil claim or claims first made against them because of a 'wrongful act.'" (Id., Section I, ¶ 1a.) The policy defines "ultimate net loss" as "the amount which the insureds are legally obligated to pay . . . for any claim or claims made against them because of a 'wrongful act' and shall include . . . 'claim expenses.'" (Id., Section V, ¶ 8.) The policy defines "wrongful act" as "any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty including, misfeasance, malfeasance and nonfeasance by any insured." (Id. ¶ 9.) The policy definition of "claim expenses" includes "[a]ttorney fees and all other litigation expenses." (Id. ¶ 2a.)

ISU is a defendant in a class-action gender discrimination suit, Varner v. Illinois State Univ., No. 95 C 1355, that is currently pending in the United States District Court for the Central District of Illinois. (Compl. ¶¶ 5, 8.) ISU is represented in that suit by its "longtime counsel," the attorney

---

[1]The policy actually identifies the insured as "Board of Regents of the Regency University System." (Compl., Ex. A, Declarations.) Like the parties, however, we will assume that ISU is covered by the policy.

defendants. (Id. ¶¶ 11, 13.) During the course of the Varner litigation, the judge presiding over the case granted the plaintiffs' motion for sanctions against the attorney defendants' for their abuse of the discovery process. (Id. ¶¶ 9-24.) The Court imposed the sanctions solely against the attorney defendants, not against ISU. (See Mem. Supp. Attorney Defs.' Mot. Dismiss, Ex. A at 47.²) TIG has incurred fees and costs in excess of $700,000 "[a]s a result of defending against the motion for sanctions and the litigation arising therefrom," and seeks to recover those costs from defendants. (Compl. ¶ 25.)

## Discussion

### The Attorney Defendants

In Counts I and III, TIG asserts subrogation claims against the attorney defendants. Though they are not denominated as such, Count I is a conventional subrogation claim and Count III is a legal subrogation claim. Conventional subrogation claims arise from contract; legal subrogation claims arise by operation of law. Schultz v. Gotlund, 138 Ill. 2d 171, 173, 561 N.E.2d 652, 653 (1990); American Nat'l Bank & Trust Co. of Chicago v. Weyerhaeuser Co., 692 F.2d 455, 460 n.12 (7th Cir. 1982). The attorney defendants contend that TIG is barred by Illinois public policy from asserting ISU's legal malpractice claim against them via either subrogation doctrine.

We disagree. Though the state courts have held that the assignment of legal malpractice claims violates Illinois public policy, we do not believe they would reach the same conclusion on subrogation. The rationale for prohibiting assignment was summed up by the court in Christison v. Jones, 83 Ill. App. 3d 334, 405 N.E.2d 8 (3rd Dist. 1980), which said:

---

²We may take judicial notice of the proceedings in Varner because they are directly related to the issues in this suit. Green v. Warden, 699 F.2d 364, 369 (7th Cir. 1983).

> "The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandising such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client."

83 Ill. App. 3d at 339, 405 N.E.2d at 11 (quoting Goodley v. Wank & Wank, Inc., 133 Cal. Rptr. 83, 87 (App. Ct. 1976)).

The concerns expressed by the Cristison court, as our court of appeals has noted, have little application to subrogation. Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C., 197 F.3d 1190, 1192 (7th Cir. 1999). Unlike assignment, subrogation would not lead to the merchandising of malpractice claims. Though a claim can be assigned to anyone willing to pay for it, subrogation rights can be exercised only by those who have fulfilled a duty, imposed by contract or law, to pay for another's loss. Thus, allowing subrogation of legal malpractice claims would not make them a commodity available to the highest bidder.

Subrogation would also not encourage baseless lawsuits. Excess insurers have no more or less incentive to file malpractice suits than do the uninsured. Faced with a large judgment caused by malpractice, both would want to shift some or all of the liability to the attorneys who mishandled the case. Certainly, that potential shift in liability creates a temptation to sue for malpractice when none

exists. But there is no reason to believe that excess insurers fall prey to that temptation more often or easily than do the uninsured.

Moreover, though malpractice litigation may increase if subrogation is allowed, any such increase would be appropriate as a matter of policy. Clients covered by excess insurance policies have little incentive to sue their attorneys for malpractice. Why should they engage in expensive and time-consuming litigation when the costs of the malpractice will be borne by their insurance company? Excess insurers, on the other hand, have every incentive to pursue subrogated malpractice claims. Because excess insurers will file malpractice suits that their insureds might not, malpractice litigation may increase. It would be an equitable increase, however, which would shift the "social costs of legal malpractice" to the attorneys responsible for it and prevent them from receiving a windfall at the expense of excess insurers. National Union Ins. Co. v. Dowd & Dowd, 2 F. Supp. 2d 1013, 1023-24 (N.D. Ill. 1998).

We also do not believe that allowing subrogation of legal malpractice claims would damage the attorney-client relationship. In theory, as Judge Norgle noted, "an attorney's independent, legal judgement might be compromised, consciously or subconsciously, because of a concern about being sued by an excess insurer." National Union, 2 F. Supp. 2d at 1023. In practice, however, an attorney's efforts to avoid a judgment so large that it would expose him to a malpractice suit by his client's excess insurer are virtually certain to be in the client's best interest as well. The notion that an attorney could or would design a defense that would result in a judgment being entered against his client, but not one large enough to implicate the client's excess carrier, simultaneously gives the legal profession far too much and far too little credit. In short, any danger that subrogation poses to the integrity of the attorney-client relationship seems far more theoretical than real.

The attorney defendants insist, however, that permitting subrogation in cases like this one would create a very real conflict between attorney and client. The malpractice alleged here, they point out, is a violation of the discovery process codified in Rules 37(d) and 26(g). Because these rules impose duties on the attorney and client jointly, an excess insurer's malpractice suit based on a discovery violation caused by the client would leave the attorney in an untenable situation: he could defend himself and betray his client, or protect his client and betray himself.

It may be, as the attorney defendants argue, that the Illinois courts would not permit subrogation of legal malpractice claims in all discovery-related malpractice cases. But we are confident that they would allow it here. Unlike the worst-case scenario posited by the attorney defendants, the malpractice alleged in this case poses no conflict at all. Under the record developed in the litigation, there is no suggestion that the sanctions were imposed because the client failed in its discovery obligations. The Varner court explicitly faulted the attorney defendants, not their client, for failing to produce documents they knew or should have known existed, and levied sanctions solely against them. (See Compl. ¶¶ 18-24; Mem. Supp. Attorney Defs.' Mot. Dismiss, Ex. A at 47.) As a result, the attorney defendants will not be faced with the Hobson's choice of protecting their client or protecting themselves to defend against a malpractice claim by TIG. Because subrogation of this legal malpractice claim will not threaten the attorney-client relationship or unduly burden the courts, it is not barred by the public policy of this State. Accordingly, TIG's motion to dismiss the subrogation claims on public policy grounds is denied.

Having determined that subrogation claims are permissible, we must now determine whether TIG has, in fact, stated a viable claim for either conventional or legal subrogation. Conventional subrogation is grounded in contract. American Nat'l Bank & Trust, 692 F.2d at 460 n.12. The policy

TIG issued to ISU contains a subrogation clause, which provides: "If the insured has rights to recover all or part of any payment we have made under this Coverage Form, those rights are transferred to us." (Compl., Ex. A, Section IV, ¶ 9.) If, as TIG alleges, ISU was damaged as a result of the attorney defendants' mishandling of discovery in the Varner case, then ISU has a malpractice claim against them. Belden v. Emmerman, 203 Ill. App. 3d 265, 268, 560 N.E.2d 1180, 1181 (1st Dist. 1990) (noting that "the elements of a claim of legal malpractice are: (1) the existence of an attorney-client relationship, (2) a breach of a duty arising from that relationship, (3) causation, and (4) damages"); Goran v. Gleiberman, 276 Ill. App. 3d 590, 595, 659 N.E.2d 56, 60 (1st Dist. 1995) ("Where the defendant's neglect is a direct cause of the legal expenses incurred by the plaintiff, the attorney fees incurred are rewardable as damages."). Moreover, if TIG paid ISU for those damages, the subrogation clause of the policy transfers ISU's malpractice claim to TIG. Thus, TIG has a conventional subrogation claim for legal malpractice against the attorney defendants.

Even if TIG can state a conventional subrogation claim, the attorney defendants contend that it has not because neither the word subrogation nor the contract provision on which the claim is based appears anywhere in Count I. We disagree. Though Count I is not a model conventional subrogation claim, it is sufficient to withstand a motion to dismiss. In that count, TIG explicitly alleges the elements of the underlying malpractice action and incorporates other allegations of the complaint that identify TIG as ISU's subrogee and incorporate the insurance policy that contains the subrogation clause. Because ISU is not a party to the case, it is reasonable to infer from the complaint as a whole that TIG is asserting the malpractice claim against the attorney defendants as subrogee under the insurance policy attached to the complaint. The attorney defendants' motion to dismiss Count I is denied.

We agree, however, with the attorney defendants that TIG's Count III claim for legal subrogation must be dismissed. To state such a claim, TIG must allege that: (1) it has paid ISU in full for the damages caused by the malpractice; (2) the attorney defendants are primarily liable for the money it paid to ISU; (3) ISU has a right to recover from the attorney defendants, which TIG seeks to enforce; and (4) TIG did not voluntarily pay ISU for the damages, but was legally obligated to do so. American Nat'l Bank, 692 F.2d at 460-63. The attorney defendants contend that TIG acted as a volunteer when it paid ISU's damages.

The Court agrees. The plain language of the policy TIG issued to ISU absolved it of any responsibility to pay legal fees occasioned by the attorney defendants' malpractice. The policy obligates TIG to pay to ISU money that ISU is "legally obligated to pay for any civil claim or claims first made against [it] because of a 'wrongful act.'" (Id., Section I, ¶ 1a.) A "wrongful act" is defined as "any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty including, misfeasance, malfeasance and nonfeasance *by any insured.*" (Id., Section V, ¶ 9) (emphasis added). The policy definition of "insured" specifically excludes "any person working on a retainer or contractual agreement." (Id., Section II, ¶ 4.) Even assuming that the sanctions motion at issue here constitutes a "civil claim" within the meaning of the policy, and that ISU was legally obligated to pay the fees that the attorney defendants charged it for their defense of that motion, the policy plainly absolved TIG of any responsibility to reimburse ISU for those fees. TIG has alleged that the damages ISU, and in turn TIG, incurred were due solely to the malpractice of the attorney defendants. (Compl. ¶¶ 8-24.) The attorney defendants, who were working on retainer or contractual agreement, are not insureds as defined by the policy. Thus, TIG was not required to pay ISU for the fees the attorney defendants charged it for defending against the sanctions motion.

TIG asserts that it "was obligated to pay for ISU's defense" because attorney's fees are included in the definition of "ultimate net loss." (Br. Resp. Attorney Defs.' Mot. Dismiss at 5.) That may be an accurate interpretation of the policy as it applies to the <u>Varner</u> litigation in general, but not to the sanctions motion in particular. The sanctions motion, according to TIG's own allegations, was provoked solely by the negligence of ISU's retained counsel, not by the negligence of any insured. As such, any amount ISU paid to its lawyers in connection with, or as a result of, the sanctions motion, was not "ultimate net loss" for which TIG was even arguably responsible. (Compl., Ex. A, Section V, ¶ 8.) Given the plain language of the policy and the facts as alleged by TIG, we conclude that any payments TIG made to ISU for legal fees in connection with the sanctions motion were made voluntarily. The legal subrogation claim asserted by TIG in Count III of the complaint is, therefore, dismissed.

The malpractice claim TIG asserts in Count II suffers the same fate. The elements of a legal malpractice claim are: "(1) the existence of an attorney-client relationship, (2) a breach of a duty arising from that relationship, (3) causation, and (4) damages." <u>Belden</u>, 203 Ill. App. 3d at 268, 560 N.E.2d at 1181. TIG cannot satisfy the first element. "The attorney-client relationship is a voluntary, contractual relationship that requires the consent of both the attorney and the client." <u>In re Chicago Flood Litig.</u>, 289 Ill. App. 3d 937, 941, 682 N.E.2d 421, 425 (1st Dist. 1997). TIG has no direct relationship with the attorney defendants, but argues that the "tripartite relationship" that exists among an attorney, an insured and a primary insurer should be expanded to include the excess insurer. In its view, an excess insurer is akin to a primary insurer once the insured has exhausted its self-insured retention.

The Court disagrees. There is major distinction between primary and excess insurers in this context. Unlike excess insurers, primary insurers have a duty to defend their insureds against any claim that potentially falls within the coverage of the policy. Nandorf v. CNA Ins. Cos., 134 Ill. App. 3d 134, 136, 479 N.E.2d 988, 991 (1st Dist. 1985). That duty includes the right to hire and direct counsel for the insured. Id., 134 Ill. App. 3d at 136-37, 479 N.E.2d at 991. It would be difficult, as Judge Norgle observed, to exclude the primary insurer, which contracts with the attorney, pays his fees and directs his work, from the attorney-client relationship. National Union, 2 F. Supp. 2d at 1017.

TIG has not alleged that its relationship with the attorney defendants is like that of a primary insurer. TIG's policy gives it "the right but not the duty to assume, in the name of the insureds, the investigation and/or defense of any claim." (Compl., Ex. A, Section I, ¶ 3b.) TIG did not exercise the right to retain counsel to represent ISU in the Varner litigation. Rather, it admits that the attorney defendants are the "longtime counsel" of ISU. (Compl. ¶ 11.) TIG also does not allege that it can or does direct the activities of the attorney defendants. And at least one of the conditions of the policy, which requires ISU to "direct defense counsel . . . to furnish [TIG] with information . . . to evaluate the act, error, omission [or] claim," suggests that it can't. (Id., Ex. A, Section IV, ¶ 3c(3)(e).) TIG's admission that it did not retain the attorney defendants and its failure to allege that it directs their activities is fatal to its malpractice claim. This claim will be dismissed without prejudice, however, in the unlikely event that TIG can allege that it has the authority to direct the activities of the attorney defendants.[3]

---

[3] If TIG had the power to direct the attorney defendants' activities, surely it would have instructed them not to oppose the sanctions motion or to take other steps to minimize the damage attributable to that portion of the litigation.

### Chicago Insurance Company

In Count IV, TIG alleges that Chicago Insurance Company ("CIC") issued a professional liability policy to the attorney defendants and, thus, must pay TIG for the losses it suffered as a result of the attorney defendants' malpractice. (Compl. ¶¶ 42-44.) In other words, TIG seeks to recover from CIC for the losses the attorney defendants' caused TIG before the attorney defendants have been found liable for those losses. This kind of claim is known as a "direct action" and is against Illinois public policy. Richardson v. Economy Fire & Cas. Co., 109 Ill. 2d 41, 47, 485 N.E.2d 327, 329 (1985) ("[T]he public policy of this State prohibits an injured party from recovering personal injury damages against an insurance carrier on account of the negligence of its insured prior to obtaining a judgment against the insured.") The claim in Count IV is dismissed without prejudice as premature..

In Count V, captioned "Other Insurance," TIG attempts to state a claim for equitable contribution. A claim for equitable contribution arises when two or more insurers have policies that cover the same parties, insurable interests and risks. Home Indem. Co. v. General Accident Ins. Co. of Am., 213 Ill. App. 3d 319, 321, 572 N.E.2d 962, 963 (1st Dist. 1991). TIG alleges that its policy insures ISU against the risk of "any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty including, misfeasance, malfeasance and nonfeasance by any insured." (Compl., Ex. A, Section V, ¶ 9.) TIG alleges that CIC provides the attorney defendants with professional liability coverage. (Compl. ¶ 42.) In other words, TIG has affirmatively alleged that CIC does not insure the same party against the same risks. It cannot, therefore, state a claim for equitable contribution against CIC. Count V is dismissed.

## Conclusion

For the reasons stated above, the motion to dismiss of defendants Giffin, Winning, Cohen & Bodewes, P.C., Carol Hansen Posegate, Gregory K. Harris and Arthur B. Cornell, Jr. is granted as to the malpractice claim asserted against them in Count II, which is dismissed without prejudice, and the legal subrogation claim asserted against them in Count III, which is dismissed with prejudice. The conventional subrogation claim asserted against those defendants in Count I will stand. Chicago Insurance Company's motion to dismiss the direct action claim asserted against it in Count IV and the equitable contribution claim asserted against it in Count V is granted, and those claims are dismissed with prejudice. Plaintiff has twenty-one (21) days from the date of this Memorandum Opinion and Order to amend the malpractice claim asserted in Count II, if it can do so and remain in compliance with Rule 11. If plaintiff does not amend the malpractice claim in that time period, it will be dismissed with prejudice.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

DATED: _1-31-01_